IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMANDA SCHIBERL, ) | |
| ) | Case Number 04-239 ERIE |
| Plaintiff ) | |
| ) | District Judge Sean J. McLaughlin |
| vs. ) | Magistrate Judge Susan Paradise Baxter |
| ) | |
| JOANNE B. BARNHART, ) | |
| Commissioner of Social Security ) | |
| Defendant ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

**I.   RECOMMENDATION**

It is recommended that the Motion for Summary Judgment filed by the Plaintiff [Document # 6] be granted. It is further recommended that the Motion for Summary Judgment filed by the Defendant [Document # 8] be denied. This matter should be remanded to the Social Security Administration for further proceedings.

**REPORT**

**A.   Procedural Background**

Plaintiff (Schiberl) brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), for judicial review of the final decision of the Commissioner of Social Security, who found that Plaintiff was not entitled to disability insurance benefits (DIB) or supplemental security income (SSI) under Titles II and XVI, respectively, of the Social Security Act (Act).

Plaintiff filed applications for DIB and SSI on February 28, 2003, alleging disability since May 1, 2002, due to a diagnosis of multiple sclerosis. R. 52.[1] Plaintiff's applications for benefits were denied. R. 28 - 31. At Plaintiff's request, a hearing was held by an ALJ on

---

[1] The Court's recitation of relevant facts is derived from the transcript of the administrative record filed by the Commissioner as part of her answer in accordance with § 205(g)of the Act, 42 U.S.C. § 405(g), which is referred to hereinafter as "R." Additional citations appear as necessary.

1

January 15, 2004, at which Plaintiff and a Vocational Expert testified. Following the hearing, the ALJ held the record open and received more medical records.

The ALJ issued a written decision on May 6, 2004 finding that Plaintiff was not disabled. On August 25, 2004, Plaintiff sought administrative review from the SSA's Appeals' Council, which was denied.

Plaintiff now seeks judicial review. Both Schiberl and the Commissioner[2] have filed a motion and cross-motion, respectively, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and the matter is ripe for disposition by this Court.

**B.      Factual Background**

Plaintiff Amanda Schiberl was born on December 26, 1964. Plaintiff was thirty-nine years old when the Commissioner issued her final decision and as such is considered a younger individual under the Act. R. 370. Plaintiff has a high school education and has a broadcasting certificate. R. 370. Plaintiff alleges that she has been unable to work since May 1, 2002 as a result of multiple sclerosis.

**C.      Medical Background**

In April of 1989, Plaintiff was hospitalized with a diagnosis of bipolar disorder; dependant personality disorder; and borderline personality disorder. R. 108.

On July 31, 1990, Plaintiff saw her family physician, Dr. Paul Grubb of the Marianne Family Practice. The medical notes from that visit show that Plaintiff had suffered from severe

---

   2 Included in the record is a medical report from Dr. Rock Heyman regarding a patient other than Plaintiff. Not only is the medical report erroneously included in this medical records, but the U.S. Attorney cites to it at least three times arguing that it is evidence of Plaintiff's ability to work. Document # 9, pages 5, 9-10 and 12. Due to the privacy considerations of someone not a party to this litigation, the mere inclusion of such records is troubling to this Court, but the repeated references to these records as evidence of this Plaintiff's ability to work is shocking. Because of the glaring inaccuracies contained within the brief, this Court considered striking the pending motion and ordering that a new motion be filed; however, in the interests of expediency and fairness to the Plaintiff, the Court has decided otherwise.

depression for over two years coupled with panic attacks and stress headaches. Plaintiff was diagnosed with depression and musculoskeletal cephalgia[3]. R. 241.

On November 17, 1995, Dr. Grubb noted that Plaintiff suffered from intermittent headaches for over three years. R. 240.

On December 18, 1995, Dr. Grubb noted that Plaintiff had suffered from sleep problems for two years and noted that she was taking Zoloft, Ultram, and Flexeril and that she had had no severe headaches. R. 239.

On April 15, 1996, Plaintiff was treated by Dr. Grubb with an injection of Imitrex for a severe migraine headache. R. 237.

On June 30, 1997, Plaintiff presented to Dr. Grubb complaining of radiating lumbar pain and tingling in her legs which had been going on for two months. R. 234. By July 8, 2005, Plaintiff complained that the leg pain was worsening. Dr. Grubb prescribed Flexeril and Relafen for the pain. R. 234. On July 28, 1997, Plaintiff complained of her left eye blurring along with pain radiating from her eye to her jaw and pain in her tail bone. R. 232.

On October 30, 1997, Plaintiff presented to Dr. Grubb with lumbar pain and numbness and tingling in her legs.

On April 9, 1997, Plaintiff presented to Dr. Grubb complaining of migraine headaches. R. 230.

On September 30, 1997, Plaintiff presented to Dr. Grubb complaining of a severe sudden on-set headache and dizziness. R. 229.

On January 7, 1999, Plaintiff complained to Dr. Grubb of tingling in her upper extremities with a hot radiating sensation and described dropping things. R. 227. On January 19, 1999, Plaintiff continued to complain of back pain, leg pain and weakness. R. 224.

On March 27, 2002, Plaintiff presented to Dr. Grubb complaining of lightheadedness, shakiness in her arms and legs, decreased appetite, difficulty sleeping and an inability to get warm. R. 215.

---

[3] In lay terms, headaches.

On May 8, 2002, Plaintiff complained to Dr. Grubb of numbness in her lower legs and arms, tongue, lips and chin. Dr. Grubb diagnosed her with paresthesias[4] and ordered an MRI. R. 212.

On May 21, 2002, Plaintiff presented to Dr. Grubb complaining of severe lower back pain, radiating down the legs with difficulty standing. R. 209 - 211. Dr. Grubb noted that her symptoms were sciatica. R. 208.

On May 22, 2002, Plaintiff underwent a lumbar spine MRI which was essentially unremarkable. R. 164. Plaintiff had a cranial MRI done on May 29, 2002. The MRI indicated multiple hyperintensive white matter changes in both cerebral hemispheres involving deep white matter and subcortical white matter. Such findings were consistent with a demyelinating process such as multiple sclerosis. R. 163.

On June 13, 2002, Plaintiff presented to Dr. Grubb complaining of weakness, numbness in her mouth and tongue, difficulty speaking, numbness in her arms and legs, occasional incontinence, and stabbing pain in her lower back. Dr. Grubb diagnosed her with possible multiple sclerosis and sciatica. Dr. Grubb indicated that Plaintiff was unable to work due to sciatica. R. 206. Plaintiff was referred to Dr. Benjamin Smolar, a neurologist, for further testing.

By letter dated June 20, 2002, Dr. Smolar indicated that multiple sclerosis was a suspicion and that further testing would be ordered. R. 150.

On June 25, 2002, Plaintiff presented to Dr. Grubb with similar complaints from the week before, with the addition of double vision, nausea, slurring of her words, fatigue, dizziness and aching. Dr. Grubb's notes indicate a possibility of multiple sclerosis. R. 205.

On July 1, 2002, Plaintiff had a spinal tap which confirmed a diagnosis of multiple sclerosis. R. 128. In August of 2002, Dr. Smolar noted that the previous cranial MRI had indicated white matter (indicative of multiple sclerosis) but he concluded that Plaintiff's

---

[4] Abnormal neurological sensations including numbness, tingling, burning, prickling and increased sensitivity.

complaints were largely subjective. Dr. Smolar advised Plaintiff to seek a second opinion. R. 148.

In September of 2002, Plaintiff saw Dr. Galen Mitchell, a neurologist at the University of Pittsburgh Hospital. Dr. Mitchell's initial impression was that Plaintiff was suffering from many neurologic complaints, that she was anxious and depressed with a strong element of somatization[5]. Dr. Mitchell referred Plaintiff to a urologist for her bladder complaints and ordered more testing including another cranial MRI. R. 285 -287.

On November 17, 2002, Plaintiff followed up with Dr. Mitchell who indicated that although Plaintiff had normal motor strength and upper extremity function, Plaintiff had relapsing-remitting multiple sclerosis as supported by her clinical course and second cranial MRI. Plaintiff was directed to begin Avonex treatment. R. 282 -283.

On December 13, 2002, Plaintiff was treated at the Emergency Room of Clarion Hospital for complaints of racing heartbeat. Plaintiff's EKG was markedly abnormal and an echocardiogram was also suspicious and Plaintiff was diagnosed with supra ventricular tachycardia (SVT).[6]

On January 7, 2003, Plaintiff presented to Dr. Grubb complaining of racing heartbeat, dizziness, double vision and difficulty opening her left eye. Dr. Grubb diagnosed sinus ventricular tachycardia, multiple sclerosis and Raynaud[7]. R. 201 - 202.

On January 13, 2003, Plaintiff was examined by Dr. Michael Hagerty of the Pennsylvania Heart Group. Dr. Hagerty indicated that Plaintiff had well documented SVT and noted that her EKG of December 13, 2002 revealed a narrow complex tachycardia with a heart rate of 220 beats per minute. Dr. Hagerty referred Plaintiff to Dr. Chenarides of the Allegheny

---

[5] Somatization is the process by which psychological needs are expressed in physical symptoms.

[6] An abnormally accelerated rhythm of the heart that results from a rapidly firing electrical focus. Rates may be in the range of 150 - 250 beats per minute.

[7] Paroxysmal spasms of the digital arteries causing blanching of the fingers and toes.

5

General Hospital for "an electrophysiologic evaluation with a specific question as to whether the patient would be a candidate for EP study and potential curative ablation." R. 197 - 198. It is unclear from the record before this Court whether Plaintiff pursued this medical treatment.

Plaintiff was seen again by Dr. Mitchell on February 10, 2003. Plaintiff reported severe lower back pain along with severe pain and numbness in the bilateral lower extremities, severe fatigue, mild upper extremity pain, blurred vision with photophobia[8], and increased frequency of urination. In the notes, Dr. Mitchell indicated that Plaintiff had not been on Avonex long enough to show improvement in her multiple sclerosis symptoms. Plaintiff was referred for an MRI of her back and was referred to a neuro-opthamologist for her continued blurred vision. R. 275 - 276.

On February 12, 2003, Plaintiff underwent an MRI on her spine. The MRI revealed a small right paracentral disc herniation at the T8-9 level, mild focal arachnoiditis at T 12 and L1, with a clumped appearance and adherent to the spinal cord in places, along with a focal disc herniation at T8-9. R. 273 - 274.

On March 19, 2003, Plaintiff presented at the Clarion Hospital Emergency Room with a racing heartbeat. An EKG revealed abnormal results. R. 122.

On March 21, 2003, Plaintiff was examined by Dr. Misha Pless, a neuro-opthamologist. Dr. Pless noted that Plaintiff suffered mild bilateral optic neuropathy, and based upon her demyelinating disease, diagnosed mild bilateral optic neuritis. The doctor noted that Plaintiff had a mild non-specific visual field defect centrally and concluded the she has pain on movement and photo-sensitivity (one of the signs of early optic neuritis). The doctor noted that Plaintiff had symptoms of blepharospasm and discomfort of the upper eyelid. The doctor also noted that Plaintiff had a pineal cyst which could be related to the photosensitivity. Plaintiff's visual acuity with contact lenses was 20/25. Plaintiff was prescribed special tinted eyeglasses in order to combat her photosensitivity. R. 249 - 250.

On May 1, 2003, Dr. Mitchell examined Plaintiff, noting new left hip pain, aching about

---

[8] Extreme sensitivity to light.

the knees, occasional ptosis[9], sleep problems, including jerkiness in her legs, grumpy mood and fatigue. Dr. Mitchell indicated that Plaintiff had decreased motor strength and difficulty with tandem walking. R. 271.

On May 5, 2003, a state agency physician completed a Physical Residual Functional Capacity Assessment about Plaintiff after examining her medical records. The physician concluded that Plaintiff could lift/carry twenty pounds occasionally; lift/carry ten pounds frequently; stand/walk about two hours in an eight-hour workday; sit about six hours in an eight hour workday, and push/pull on an unlimited basis. R. 86.

On May 12, 2003, Plaintiff was examined by Dr. Mitchell. Plaintiff complained of lightheadedness, increased facial numbness, hip pain, lower back pain and onset and terminal insomnia. Plaintiff's medications were adjusted by Dr. Mitchell. R 267.

On October 10, 2003, Plaintiff presented to Forrest Henry, D.O. for reevaluation of her multiple sclerosis symptoms as well as her other medical problems (history of SVT, chronic sinusitis, and bilateral wrist pain). R. 305. On ocotber 24, 2003, Dr. Henry evaluated Plaintiff, changed his multiple sclerosis medication to Capaxone and ordered further testing. R. 329.

On November 24, 2003, Plaintiff was reevaluated by Dr. Henry, who assessed her with multiple sclerosis; decreased sensation in her right foot; possible carpal tunnel syndrome; hot flashes; mood swings; and obesity. R. 328. Dr. Henry ordered testing of Plaintiff's hand and foot and adjusted her medications.

On December 15, 2003, Plaintiff was examined by Dr. John Wagner, a podiatrist. Dr. Wagner diagnosed Plaintiff with pain in the dorsal aspect of her right foot and lower leg, consistent with a sympathetic pain disorder. Dr. Wagner referred Plaintiff to Dr. Freenock. R. 307.

On December 16, 2003, Plaintiff was seen by Dr. Dappert, a neurologist, who noted multiple areas of decreased pinprick (illustrating loss of sensation), trace weakness in the right infraspinatus and heel cord. R. 324 - 325.

---

[9] Drooping of the upper eyelid.

In December 2003, Plaintiff underwent EMG testing by Thomas Freenock, M.D. The lower extremity testing revealed normal results and the upper extremity testing showed mild carpal tunnel syndrome in the right hand. R. 319.

On December 23, 2003, Plaintiff presented to Dr. Freenock complaining of burning, swelling and pain in the right foot with discoloration and decrease in temperature. Dr. Freenock concluded that Plaintiff had evidence of a complex regional pain syndrome or RSD (reflex sympathetic dystrophy[10]) and that Plaintiff might be a candidate for a pain management consultation. R. 316.

On January 1, 2004, Plaintiff was seen in the Emergency Room for racing heart beat. R. 331.

In a letter dated January 5, 2004, and unaccompanied by any medical records, Dr. Henry summarized Plaintiff's medical condition and opined that:

> Amanda Schiberl is a patient of mine with multiple health problems including multiple sclerosis, right sided carpal tunnel syndrome, obesity, depression, history of SVT and chronic recurrent sinusitis. Her multiple sclerosis is by far her worst problem with ocular involvement, giving her blurred and double vision, muscular weakness, pain and difficulty ambulating. Her other health problems magnify these problems. Her multiple sclerosis is in exacerbation and we are consulting with neurology to try to get a handle on it. There is no way with her current symptoms that Amanda could hold any meaningful employment and as aggressive as her multiple sclerosis is, her prognosis for the future is poor.

R. 323.

On February 9, 2004, Plaintiff was evaluated by Dr. Doris Cope, director of the Pain Medicine Department at UPMC. Dr. Cope noted increased pain, burning sensation,

---

[10] Reflex sympathetic dystrophy syndrome, also known as complex regional pain syndrome, is a rare disorder of the sympathetic nervous system that is characterized by chronic, severe pain. The sympathetic nervous system is that part of the autonomic nervous system that regulates involuntary functions of the body such as increasing heart rate, constricting blood vessels, and increasing blood pressure. Excessive or abnormal response of portions of the sympathetic nervous stems are thought to be responsible for the severe pain associated with this disorder.

dysesthesia[11], allodynia[12], along with swelling, and color and temperature change. Plaintiff indicated that she was beginning to experience some of these same symptoms in her left foot, but not to the same extent. Dr. Cope listed Plaintiff's daily medications as: Copaxone, Effexor, Etodolac, Metprolol, Mirepex, Naproxen, Synthroid, Provigil, Hydrocodone, and Ibuprofen. Dr. Cope's impression was right lower extremity pain, sympathetic versus complex region pain syndrome. R. 346 - 350. Plaintiff underwent several lumbar sympathetic nerve blocks.

On February 17, 2004, Dr. Cope examined Plaintiff who reported brief improvement of pain. Dr. Cope noted pain allodynia of the right foot and now the left foot. The doctor noted erythema[13] and allodynia of both feet and assessed Plaintiff with complex regional pain syndrome of the right extremity and possibly of the left extremity. R. 341 - 343.

### D.     The Administrative Law Judge's Decision

A disability hearing was conducted on March 3, 2003. Plaintiff and a vocational expert testified at this hearing. R. 364. Several medical reports were submitted to the ALJ following the disability hearing.

On May 6, 2004, the ALJ issued his decision. The ALJ made the following findings which are listed verbatim from his decision:

> 1. The claimant meets the non-disability requirements for a period of disability and disability insurance benefits set forth in § 216(i) of the Act and is insured for benefits through the date of this decision.
>
> 2. The clamant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> 3. The claimant's multiple sclerosis, supraventricular tachycardia, and degenerative disc disease are "severe" impairments, based upon the requirements at 20 C.F.R. §§ 404.1520 and 416.920.
>
> 4. These medically-determinable impairments do not meet or medically equal the criteria of an impairment listed in Appendix 1, Subpart P, part

---

[11] An unpleasant abnormal sensation.

[12] Condition in which ordinarily nonpainful stimuli evoke pain.

[13] Redness of the skin produced by congestion of the capillaries.

        404, 20 C.F.R.

5. The claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the residual functional capacity to perform work that does not require: exertion above the sedentary level; or any climbing; or more than occasional balancing, stooping, kneeling, crouching, or crawling; or exposure to hazards, such as heights and dangerous machinery.

7. The claimant in unable to perform any of her past relevant work.

8. The claimant is a "younger individual age 18 - 44."

9. The claimant has a high-school education.

10. The claimant has no transferable skills from any past relevant work.

11. The claimant has the residual functional capacity to perform a significant range of sedentary work.

12. Although the claimant's exertional limitations do not allow her to perform the full range of sedentary work, using medical-vocational rule 201.28 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as a cashier, a clerk, a packager, and a surveillance system monitor.

13. The claimant was not under a disability, as defined in the Act, at any time through the date of this decision.

R. 19 - 20 (internal citations omitted).


**E.     Standards of Review**

The Social Security Act provides limited judicial review of a final decision of the Commissioner (effectively that of the ALJ where, as in this case, the Appeals Council has denied the applicant's request for review). In reviewing the Commissioner's decision, this court may not decide facts anew, reweigh the evidence, or substitute this court's judgment for that of the Commissioner or, by extension, the ALJ. See Herron v. Shalala, 913 F.3d 329, 333 (7th Cir. 1994). Rather, this court must affirm a decision if it is supported by substantial evidence and the ALJ has made no error of law. 42 U.S.C. § 405(g); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Pierce v. Underwood, 487 U.S. 552, 564-65

(1988) quoting Consolidated Edison v. NLRB, 305 U.S. 197, 229 (1938). See also Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Plaintiff contends that the ALJ's decision is not supported by substantial evidence.

A disability is defined under the Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (Supp. 2002); 20 C.F.R. § 404.1505(a) (2002). A claimant is unable to engage in substantial gainful activity when "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 423(d)(2)(A).

The Commissioner must perform a five-step sequential evaluation process to make disability determinations under the regulations. See 20 C.F.R. § 416.920. If the claimant fails to meet the requirements at any step in the process, the Commissioner may conclude that the claimant is not disabled under the Act. The ALJ must determine, in order: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the claimant's severe impairment meets or equals the criteria of an impairment listed in 20 C.F.R pt. 404, subpt. P, app. 1; (4) if not, whether the claimant's impairment prevents him from performing his past relevant work; and (5) if so, whether the claimant can perform any other work which exists in the national economy in light of his age, education, work experience and residual functional capacity. See 20 C.F.R. §§ 404.1520, 416.920; Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000).

In this case, the ALJ evaluated the case under these guidelines and determined, at step five, that Plaintiff Schiberl could perform work in the national economy. R. 20. Specifically, the ALJ concluded that: (1) Plaintiff was not currently employed in substantial gainful activity; (2) that she has an impairment or a combination of impairments considered "severe" pursuant to the requirements of 20 C.F.R. § 404.1520(c) and 416.920(b); (3) that these impairments did not meet the criteria for listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) that

11

Plaintiff retained the residual functional capacity to perform a significant range of sedentary work; and (5) that there were other jobs in the national economy that Plaintiff could perform. R. 15 - 19.

Plaintiff has the burden of establishing that he is disabled under the Act. See 20 C.F.R. §§ 404.1512, 416.912.

**F.     Discussion**

Plaintiff argues that the ALJ failed to properly analyze the uncontroverted medical records. Specifically, Plaintiff argues, among other errors, that the ALJ did not factor in Plaintiff's complex regional pain syndrome or reflex sympathetic dystrophy of the lower extremities. Defendant does not advance an argument in opposition to this point.

In determining a disability claim, the ALJ is required by regulation to "analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled." Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999) citing 20 C.F.R. § 404.1523. An ALJ must explain reasons for rejecting uncontradicted medical evidence. Schaaf v. Matthews, 574 F.2d 157 (3d Cir. 1978). Remand is appropriate in cases where the ALJ has failed to fully analyze all the medical evidence (Blood v. Barnhart, 80 Fed.Appx. 773 (3d Cir. 2003)) or to offer a clear explanation as to why medical evidence was rejected (Altman v. Commissioner of Social Security, 124 Fed.Appx. 748 (3d Cir. 2005)).

In this case, the ALJ has not made any reference to the medical records and diagnosis of complex regional pain syndrome of the right extremity and possibly of the left extremity by Dr. Cope. These records were submitted after the disability hearing but before the record closed (see R. 4), were available to the ALJ in the record, yet this diagnosis is not discussed in the ALJ's finding. Therefore, remand is appropriate.

**III.    CONCLUSION**

For the foregoing reasons, it is recommended that the Motion for Summary Judgment

filed by the Plaintiff [Document # 6] be granted.  It is further recommended that the Motion for Summary Judgment filed by the Defendant [Document # 8] be denied.  This matter should be remanded to the Social Security Administration for further proceedings.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Local Rule 72.1.4 B, the parties are allowed ten (10) days from the date of service to file written objections to this report.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to timely file objections may constitute a waiver of any appellate rights.


                                  S/ Susan Paradise Baxter
                                  SUSAN PARADISE BAXTER
                                  Chief United States Magistrate Judge


Dated: August 31, 2005